UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Bank of Camden, a Tennessee banking association, | ) ) ) | |
| | ) | No. 12 C 6699 |
| Plaintiff, | ) ) | |
| v. | ) ) | Judge Thomas M. Durkin |
| Village of West Dundee, an Illinois municipal corporation, et al., | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Bank of Camden (the "Bank") brought this lawsuit against the Village of West Dundee (the "Village") and Springhill Gateway, LLC ("Springhill")[1] alleging that the Village is disproportionately distributing funds from a special service area in violation of the Special Service Area Tax Law (the "SSA Act"), 35 ILCS 200/27-5 *et seq.*, and a local ordinance enacted thereunder. Presently before the Court is the Village's motion to dismiss the Bank's complaint for failure to state a claim. R. 13. For the following reasons, the Village's motion is granted.

---

[1] The Bank actually sued two entities named Springhill Gateway, LLC, one an Illinois limited liability company and the other a Delaware limited liability company. The Court refers to both entities collectively as "Springhill." On November 26, 2012, the Court (Pallmeyer, J.) entered a default judgment against Springhill. R. 24. The Bank was supposed to file an affidavit to prove up the amount of its judgment on or before April 2, 2013. R. 36. To date, it has not done so.

1

## Background[2]

This case involves the renovation of Spring Hill Gateway Shopping Center ("Shopping Center"), which is located in the Village. In 2007, Springhill owned the entire Shopping Center and asked the Village to provide public assistance to fund renovations. In 2008, the Village set up a Tax Increment Financing District in order to provide Springhill with $4 million in initial funding for renovations. By 2009, that money was running out. Springhill then asked the Village to establish some other mechanism to provide additional funding for renovations.

This time, the Village decided to establish a "special service area" pursuant to the SSA Act. The SSA Act generally allows a municipality to levy additional property taxes in a specific geographic area for the purpose of providing special services not otherwise available to the entire municipality. On December 7, 2009, the Village created a special service area under Village Ordinance 09-27 in the principal amount of $1.5 million. The special service area was revised and formally approved as Village Ordinance 10-15 on June 7, 2010 (the "Ordinance"). The Village issued special service area bonds to raise the $1.5 million that would be used for renovations, and then imposed additional property taxes on the Shopping Center through 2029 that would be used to pay off the bonds.

The Shopping Center contains approximately 180,000 square feet of retail space. In July 2012, the Bank became the fee simple owner of 60,000 square feet of

---

[2] The following background is taken from the allegations in the Bank's complaint, which the Court accepts as true for purposes of a motion to dismiss.

that space (the "East Property"). Springhill continues to own the remaining 120,000 square feet of space (the "West Property").

After acquiring the East Property, the Bank became concerned that the proceeds of the bonds were being spent mainly to renovate the West Property. So far, $866,422 of the $1.5 million in proceeds from the bonds has been spent. Of that, $850,167 benefitted the West Property while only $16,255 benefitted the East Property. Meanwhile, the Bank or any subsequent owner of the East Property must continue paying its share of the additional property taxes through 2029.

The Bank filed suit against the Village and Springhill, alleging that the sharp disparity in disbursements between the East and West Properties violates the SSA Act and the Ordinance.

**Standard of Review**

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under notice pleading standards, a complaint "must be enough to raise a right to relief above the speculative level," *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007), and "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "In evaluating the sufficiency of the complaint, [courts] view it in the light most favorable to the plaintiff, taking as true all well-pleaded factual

3

allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). Moreover, "[d]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir.1998).

## Analysis

### I. Jurisdiction

The Bank invoked diversity jurisdiction to file this case in federal court. Diversity jurisdiction only exists if the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a). In its motion to dismiss, the Village argues that the Bank has not adequately alleged that the amount in controversy in this case exceeds $75,000.

To establish diversity jurisdiction, a plaintiff "need demonstrate no more than a good faith, minimally reasonable belief that the suit might result in a judgment in excess of [$75,000]." *Normand v. Orkin Exterminating Co.*, 193 F.3d 908, 910 (7th Cir. 1999); *see also Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 881 (7th Cir. 2001). "[U]nless recovery of an amount exceeding the jurisdictional minimum is legally impossible, the case belongs in federal court." *Back Doctors Ltd. v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 830 (7th Cir. 2011).

This test is easily met here. This case involves a dispute over $1.5 million in proceeds from special service area bonds, $866,422 of which has already been disbursed. The Bank alleges that although its East Property occupies a third of the

total square footage of retail space in the Shopping Center, the East Property has received only $16,255 (less than two percent) of the disbursements. If those disbursements were issued in proportion to square footage, as the Bank apparently advocates, then the East Property should have received $288,807 of the $866,422 spent to date. In other words, the shortfall at issue may be as high as $272,552. Moreover, the Bank also seeks relief for the remaining, undisbursed $633,578. The Bank has therefore established a minimally reasonable belief that the amount in controversy exceeds $75,000 and that this Court has jurisdiction to hear this case.

## II. Alleged Violations of the SSA Act and the Ordinance

In its complaint, the Bank seeks a declaration that the Village is violating the SSA Act and the Ordinance because the special service area taxes imposed on the Bank's East Property do not bear a rational relationship to the benefits provided to the East Property. In its motion to dismiss, the Village argues that the Bank has not identified any actual provision of the SSA Act or the Ordinance that the Village is allegedly violating, and that as a result, the Bank does not state any plausible claim for relief.

The Bank's complaint and its response to the Village's motion to dismiss are each somewhat vague on this critical question—which requirements of the SSA Act or the Ordinance are actually at issue? The Bank's only reference to a specific requirement of either the SSA Act or the Ordinance is in paragraph 4 of its

5

complaint, where it quotes a portion of 35 ILCS 200/27-75.[3] The Bank appears to read Section 27-75 as always requiring "that a rational relationship must exist between the amount of tax levied and the special benefit rendered." R. 37 at 3.

Section 27-75 is not so broad. Section 27-75 actually provides two discrete methods for a municipality to apportion taxes in a special service area. The first and third paragraphs of Section 27-75 state that "[i]f a property tax is levied, the tax shall be extended . . . in the special service area . . . based on equalized assessed values." 35 ILCS 200/27-75. Such a tax can take the form of either "an *ad valorem* tax based on the whole equalized assessed value of the property," or, in some instances, an *ad valorem* tax based on "the equalized assessed value of the land in a special service area, without regard to improvements." *Id.*[4] The second paragraph of Section 27-75 then states:

> In lieu of or in addition to an *ad valorem* property tax, a special tax may be levied and extended within the special service area on any other basis that provides a rational relationship between the amount of the tax levied against each lot, block, tract and parcel of land in the special service area and the special service block rendered.

*Id.*

Read as a whole, Section 27-75 does not impose a general requirement that there be a rational relationship between the amount of tax levied on a particular

---

[3] Even then, the Bank omitted any citation identifying the quoted language as coming from 35 ILCS 200/27-75. This apparently created some confusion in the parties' briefing as to which SSA Act provision is at issue.

[4] An *ad valorem* tax is a tax "proportional to the value of the thing taxed." Black's Law Dictionary (9th ed. 2009).

6

property in a special service area and the special benefit rendered to that property. Rather, Section 27-75 requires that taxes must be apportioned within a special service area *either* "based on equalized assessed values" *or* "any other basis that provides a rational relationship between the amount of the tax levied against each lot, block, tract and parcel of land in the special service area and the special service benefit rendered." 35 ILCS 200/27-75. In other words, the SSA Act presumes that *ad valorem* taxes based on equalized assessed values are rational; the "rational relationship" test comes into play if a municipality relies on some "other" basis for apportioning taxes. *See e.g., Cnty. of Will v. Vill. of Rockdale*, 589 N.E.2d 1017, 1017-18 (Ill. App. Ct. 1992) (applying Section 27-75's rational relationship test where a special tax to pay for water main improvements "was not based on assessed values of the real property" but "was based on the percentage of front footage of each parcel to the total front footage of the streets in the special service area").

The problem for the Bank is that the Ordinance in this case apportions taxes based on equalized assessed values. R. 14-1, Ordinance § 2 ("the applicable special service area taxes (subject to allocation, determination, levy and extension on an *ad valorem* basis against each lot, block, tract and parcel of land in the Area) shall be and are hereby authorized . . ."). Because the taxes are allocated on an *ad valorem* basis, the "rational relationship" test that expressly applies only to taxes "in lieu of or in addition to an *ad valorem* property tax" does not come into play. As a result,

the Bank's "rational relationship" theory does not provide a plausible claim that the Village is violating the SSA Act or the Ordinance.[5]

## Conclusion

For the reasons stated above, the Village's motion to dismiss is granted. If the Bank has some other theory as to how the Village is violating a requirement of the SSA Act or the Ordinance, it may seek leave to file an amended complaint on or before September 6, 2013. As it stands, the Bank has not stated a plausible claim that the Village is violating the SSA Act or the Ordinance.

ENTERED:

*Thomas M Durkin*

Thomas M. Durkin
United States District Judge

Dated: August 12, 2013

---

[5] The Village also argues that the Bank's claims are foreclosed by *Grais v. City of Chicago*, 601 N.E.2d 745 (1992). According to the Village, *Grais* rejected an argument that "uniformity in taxation relative to the benefits of the [special service area] is required." R. 14 at 4. In *Grais*, the Illinois Supreme Court held that the creation of special service areas does not violate the uniformity clause of article IX, section 4(a) of the Illinois Constitution. *Grais*, 601 N.E.2d at 751. The Bank does not claim that the Village is violating the uniformity clause of article IX, section 4(a) of the Illinois Constitution. *Grais* therefore has little relevance here.

8