| | | |
|---|---|---|
| Bank of Camden, a Tennessee banking association, and Foreclosed Assets Sales and Transfer Partnership, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 12 C 6699 |
| v. | ) ) | Judge Thomas M. Durkin |
| Village of West Dundee, an Illinois municipal corporation; Springhill Gateway LLC, and Illinois limited liability company; and Springhill Gateway, LLC, a Delaware limited liability company, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Bank of Camden (the "Bank") and Foreclosed Assets Sales and Transfer Partnership ("F.A.S.T.") (collectively, "Plaintiffs") brought this lawsuit against the Village of West Dundee (the "Village") and Springhill Gateway, LLC ("Springhill")[1] alleging that the Village is disproportionately distributing funds from a special service area ("SSA") in violation of the Special Service Area Tax Law (the "SSA Act"), 35 ILCS 200/27-5 et seq., and a local ordinance enacted thereunder. Plaintiffs also allege that the Village improperly enacted a moratorium and ordinance preventing the issuance of a business license to one of their potential tenants, which

---

[1] The Bank actually sued two entities named Springhill Gateway, LLC, one an Illinois limited liability company and the other a Delaware limited liability company. The Court refers to both entities collectively as "Springhill." On November 26, 2012, the Court (Pallmeyer, J.) entered a default judgment against Springhill. R. 24. The Bank was supposed to file an affidavit to prove up the amount of its judgment on or before April 2, 2013. R. 36. To date, it has not done so.

is not a party to this complaint. Additionally, Plaintiffs allege that the Village is improperly paying legal fees related to this litigation out of SSA funds. Presently before the Court is the Village's partial motion to dismiss for failure to state a claim. R. 66. For the following reasons, the Village's motion is granted in part and denied in part.

## Background[2]

This case involves the renovation of Spring Hill Gateway Shopping Center (the "Shopping Center"), which is located in the Village. In 2008, the Village set up a Tax Increment Financing ("TIF") District in order to provide Springhill with $4 million in initial funding for renovations at the Shopping Center. R. 65 ¶ 18. By 2009, the Shopping Center was facing economic problems with the renovations. *Id.* ¶ 19. Springhill then asked the Village to establish some other mechanism to provide additional funding for renovations. *Id.*

This time, the Village decided to establish a "special service area" pursuant to the SSA Act. *Id.* ¶¶ 20-22. The SSA Act generally allows a municipality to levy additional property taxes in a specific geographic area for the purpose of providing special services not otherwise available to the entire municipality. *Id.* ¶ 15. On December 7, 2009, the Village adopted Ordinance 09-27 proposing the establishment of a special service area (SSA #6) and the issuance of SSA bonds in an amount not to exceed $2.95 million. *Id.* ¶ 22. The SSA was formally adopted as

_____

[2] The Court recites the background from its prior memorandum opinion, *Bank of Camden v. Vill. of W. Dundee*, 2013 WL 4052542, at *1 (N.D. Ill. Aug. 12, 2013), to the extent applicable and includes additional facts from Plaintiffs' third amended complaint. These facts are accepted as true for purposes of a motion to dismiss.

Village Ordinance 10-15 on June 7, 2010. *Id.* ¶ 23. The same day, the Village adopted Ordinance 10-16 providing for the issuance of SSA tax bonds, establishing a special service pursuant to the SSA Act and reducing the principal amount of the SSA bonds to $1.5 million. *Id.* ¶ 24. The SSA bonds for SSA #6 were to be repaid through a levy of property taxes for the properties in the SSA. *Id.* ¶ 28.

The Shopping Center contains approximately 180,000 square feet of retail space. F.A.S.T. owns approximately 60,000 square feet of that space (the "East Property"). R. 65 ¶ 8.[3] The remaining 120,000 square feet of the center lies west of the East Property (the "West Property"). *Id.* ¶ 9.

Notwithstanding the $1.5 million bond amount in Ordinance 10-16, the taxes assessed upon the East Property were based on the original amount of $2.95 million proposed in Ordinance 09-27. *Id.* ¶ 29. So far, $866,423 of the $1.5 million in proceeds from the bonds has been spent. R. 65 ¶ 30. Of that $866,423, only $16,255 benefitted the East Property. *Id.* The Bank or any subsequent owner of the East Property must continue paying its share of the additional property taxes through 2029. *Id.* ¶ 46.

In 2013, the East Property, which takes up 33% of the total square footage of SSA #6, was responsible for 44% of the SSA tax burden and did not receive any SSA distributions. *Id.* ¶¶ 31, 38. The East Property was also encumbered with a tax rate increase associated with the SSA #6 bonds within the TIF which devalued the East Property by $500,000. *Id.* ¶¶ 32, 40.

---

[3] Plaintiffs do not allege the date F.A.S.T. became the owner of the East Property.

On January 28, 2014, the Salvation Army applied for a business license to occupy approximately 25,000 square feet as a tenant of the East Property owned by F.A.S.T. *Id.* ¶ 53. On February 3, 2014, approximately five business days after the Salvation Army's application for a business license was submitted, the Village voted to approve a 90-day moratorium which "was intended to apply to any new business registrations or occupancy permits for businesses selling merchandise not classified by the Village as 'new.'" (the "Moratorium") *Id.* ¶¶ 56, 72.

On May 5, 2014, the Village amended its Zoning Ordinance prohibiting resale stores such as the Salvation Army in the B-2 zoning district where the East and West Properties lie. *Id.* ¶ 71. On or about May 9, 2014, the Village's Business License Commission ("BLC") sent the Salvation Army a letter denying its application for a business license. *Id.* ¶ 58. The letter was a result of a meeting conducted by the BLC on May 6, 2014. *Id.* ¶¶ 59, 60. Neither the BLC meeting nor its agenda was published or noticed. *Id.* ¶¶ 61-62. There are no minutes to the meeting. *Id.* ¶ 63.

F.A.S.T. had an executed lease with the Salvation Army to lease approximately 25,000 square feet of the East Property from F.A.S.T.[4] The lease was conditional upon the Salvation Army securing a business license from the Village. *Id.* ¶ 72. The Salvation Army terminated its lease with F.A.S.T. because the Village "effectively denied Salvation Army's business license by the passage of its zoning amendment prohibiting resale activities in the B-2 zoning district." *Id.* ¶ 73.

---

[4] Plaintiffs do not allege the date the lease was signed.

On August 21, 2012, the Bank filed suit against the Village and Springhill, alleging that the sharp disparity in disbursements between the East and West Properties violates the SSA Act and the local ordinance. R. 1. On September 27, 2012, the Village filed a motion to dismiss the complaint. R. 13. On January 14, 2013, the case was reassigned to the undersigned judge. R. 30. On August 12, 2013, the Court granted the Village's motion to dismiss giving the Bank leave to amend. R. 39.

Since the filing of the Bank's original complaint, the Village has been represented by the law firm of DeAno & Scarry, LLC. R. 65 ¶ 83. DeAno & Scarry, LLC has invoiced the Village for its legal fees related to this case, and has been paid out of the SSA #6 improvement fund established pursuant to Village Ordinances 10-15 and 10-16. *Id.* ¶ 84.

On October 11, 2013, the Bank filed an amended complaint. R. 47. On April 11, 2014, the Village filed its second motion to dismiss for failure to state a claim. R. 57. On May 5, the Bank filed a second amended complaint naming F.A.S.T., whom it identified as the owner of the East Property, and the Bank, whom it identified as "the authorized agent for F.A.S.T.". R. 61. On June 4, 2014, Plaintiffs filed a third amended complaint, R. 65. The Village moved to dismiss Counts I, III, IV, and V[5] of

---

[5] The Court will refer to the last Count of Plaintiffs' third amended complaint as Count V, which is mislabeled as Count VI at page 18 of their third amended complaint.

Additionally, while the Village includes Count V among the counts to dismiss in the introductory paragraph of their motion, reply, and conclusion of its reply, R. 66 at 1,

the third amended complaint on June 18, 2014. R. 66. On October 9, 2014, the Court ordered additional briefing addressing issues of standing. R. 72. For the reasons discussed below, the Village's partial motion to dismiss is granted in part and denied in part.

## Legal Standard

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws

_____

R. 68 at 1, 14, it fails to discuss Count V in the body of either its opening brief or its reply.

all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

As a general rule, the court considers only the allegations made on the face of the complaint when ruling on a motion to dismiss. *See* Fed. R. Civ. P. 12(b)(6). This includes documents the plaintiff has attached to the complaint. *Feigl v. Ecolab, Inc.,* 280 F. Supp. 2d 846, 848 (N.D. Ill. 2003); *see* Fed. R. Civ. P. 10(c). Plaintiffs assert federal subject matter jurisdiction in this case on the basis of diversity of citizenship. R. 65 ¶¶ 1-6.

## Analysis

### I. Standing

Standing is an essential component of Article III's case-or-controversy requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "Although the motion is styled as a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), challenges to standing instead pertain to this court's subject matter jurisdiction." *Dominick v. Town of Cicero*, No. 09 C 4643, 2009 WL 4506319, at *1 (N.D. Ill. Nov. 30, 2009) (citing *Am. Fed'n of Gov't Employees, Local 2119 v. Cohen,* 171 F.3d 460, 465 (7th Cir. 1999)). Accordingly, we examine Defendant's motion to dismiss based on standing under Fed. R. Civ. P. 12(b)(1). *Id.* As a jurisdictional requirement, the plaintiffs bear the burden of establishing standing. *Id.* Because standing is "not [a] mere pleading requirement[ ] but rather an indispensable part of the plaintiff's case, [it] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation."

*Lujan*, 504 U.S. at 561. Standing exists when the plaintiff suffers an actual or impending injury, when that injury is caused by the defendant's acts, and when a judicial decision in the plaintiff's favor would redress that injury. *Brandt v. Vill. of Winnetka, Ill.*, 612 F.3d 647, 649 (7th Cir. 2010); *Booker–El v. Superintendent, Indiana State Prison*, 668 F.3d 896, 899 (7th Cir. 2012) (stating that to have Article III standing, a plaintiff must demonstrate "(1) an injury-in-fact; (2) fairly traceable to the defendant's action; and (3) capable of being redressed by a favorable decision from the court"). These are the constitutional minimums for standing to sue in federal court. The injury-in-fact component requires an invasion of a legally protected interest that is concrete, particularized, and actual or imminent. *Kushner v. Ill. State Toll Highway Auth.*, 575 F. Supp. 2d 919, 922 (N.D. Ill. 2008) (citing *Lujan,* 504 U.S. at 560-61). Plaintiffs are required to demonstrate standing for each form of relief sought. *Friends of the Earth, Ind. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 185 (2000). There are also 'prudential' standing requirements, one of which is that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Edgewood Manor Apartment Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 771 (7th Cir. 2013) (citing *Warth v. Seldin,* 422 U.S. 490, 499 (1975); *Rawoof v. Texor Petroleum Co.,* 521 F.3d 750, 757 (7th Cir. 2008)).

In ruling on a motion to dismiss for lack of standing, as in any motion to dismiss, the Court must accept as true all material allegations of the complaint and must draw all reasonable inferences in favor of the plaintiff. *Lee v. City of Chicago*,

330 F.3d 456, 468 (7th Cir. 2003) (citing *Retired Chicago Police Assoc. v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996))

## A. The Bank

The Village argues that the Bank should be dismissed for lack of standing. Plaintiffs' amended complaint alleges that the Bank is the "authorized agent" for F.A.S.T. "as it relates to the [East] property," R. 65 ¶ 7. However, Plaintiffs fail to respond to the Village's argument or offer any explanation of how the Bank, as "authorized agent" of F.A.S.T., has standing. Nothing in the third amended complaint explains how the Bank's status as F.A.S.T.'s "authorized agent" confers standing on it. The third amended complaint alleges that F.A.S.T.—not the bank—owns the East Property. R. 65 ¶ 8. As the Village points out, the third amended complaint also asserts that F.A.S.T., not the Bank, had an executed lease with the Salvation Army. R. 65 ¶ 72. Beyond the unexplained reference to the Bank as "authorized agent," Plaintiffs do not allege the Bank's ownership interest in the property at issue in the case. It is not the Court's responsibility to develop arguments on behalf of the parties or root through the record for support. *Autotech Techs. Ltd. P'ship v. Automationdirect.Com, Inc.,* No. 05 C 5488, 2006 WL 1304949, at *11 (N.D. Ill. May 10, 2006) (citations omitted). Plaintiffs' failure to respond to the argument challenging the Bank's standing results in waiver. *Jones v. Connors,* 11 C 8276, 2012 WL 4361500, at *7 (N.D. Ill. Sept. 20, 2012). ("A party's failure to respond to arguments the opposing party makes in a motion to dismiss operates as a waiver or forfeiture of the claim and an abandonment of any argument against dismissing

the claim") (citing *Alioto v. Town of Lisbon,* 651 F.3d 715, 719 n. 1, 721 (7th Cir. 2011) (forfeiture occurs where the "litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss"); *Bonte v. U.S. Bank, N.A.,* 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument [in a motion to dismiss]-as the [plaintiffs] have done here-results in waiver.")) Accordingly, the Court dismisses the Bank with prejudice as a plaintiff. [6]

**B. F.A.S.T.**

In its reply brief, the Village for the first time raises the argument that F.A.S.T. does not have standing because the third amended complaint fails to allege that F.A.S.T. paid any of the property taxes associated with the East Property, including the SSA or TIF taxes. Usually, arguments raised for the first time in a reply brief are waived. *PNC Bank, Nat. Ass'n v. Tyre Works-Hoffman, LLC,* 1:12-CV-07499, 2013 WL 678145, at *5 n.2 (N.D. Ill. Feb. 25, 2013) (citing *James v. Sheahan,* 137 F.3d 1003, 1008 (7th Cir. 1998)). "However, standing is a jurisdictional requirement that is not subject to waiver." *Tyre Works-Hoffman*, at *5 n.2 (citing *U.S. v. Hays,* 515 U.S. 737, 742 (1995)). While the Village claims that "without these necessary allegations, F.A.S.T. has not pled sufficient facts to establish standing on its own behalf," R. 68 at 4, it fails to explain how the alleged absence of these facts precludes standing.

In their sur-reply, Plaintiffs argue that the third amended complaint alleges

---

[6] Because the Court finds that the Bank does not have standing, subsequent references to "Plaintiffs" throughout this opinion apply to F.A.S.T. only.

the "detriment [to the East Property] includes disproportionate taxes *viz a viz* benefits rendered which will result in additional losses to Plaintiffs due to an inability of Plaintiffs to sell the East Property while at the same time being encumbered by an overinflated tax liability." R. 65 ¶ 39. The third amended complaint also alleges that the East Property—though not specifically "Plaintiffs,"— paid the 2013 SSA and TIF tax bills. *Id.* ¶¶ 37-38. It further alleges that "SSA tax levy and TIF levy . . . overburdened the Plaintiffs' property with excessive taxes" and "the . . . imposition of the TIF district upon the East Property, in addition to taxes for SSA #6, created an overpayment obligation of the East Property." *Id.* ¶ 36. While the third amended complaint does allege that F.A.S.T. owns the East Property, *id.*, it does not allege when F.A.S.T. became the owner of the East Property, and thus, whether or when F.A.S.T. paid any of the taxes levied on the East Property. Because of those omissions, the third amended complaint does not sufficiently assert the injury of payment of excessive taxes. However, Plaintiffs also allege another injury— that the resale value of the F.A.S.T.–owned East Property has been adversely affected by the improperly assessed SSA and TIF tax rates and that the violations will continue until 2029. That allegation fares better since F.A.S.T.'s current ownership of the property would be affected by the resale value of the property based on the assessment of the taxes. Drawing all reasonable inferences in favor of the plaintiffs, the Court finds their allegations sufficient to survive dismissal on the issue of F.A.S.T.'s standing as Plaintiffs have alleged an injury with respect to the resale value of the East Property.

The Village also alleges that Plaintiffs do not have standing because the amended complaint fails to allege that the lease between F.A.S.T. and the Salvation Army was executed "when the business license was applied for or before the Moratorium." R. 68 at 4. The Village asserts that on information and belief, the lease was not signed until February 13, 2014 and was terminated by the Salvation Army on March 11, 2014, both after the Salvation Army's submission of its business license application on January 28, 2014 and after the enactment of the Moratorium on February 3, 2014. The Village also asserts that Plaintiffs do not have standing as a potential landlord for Counts III and IV to file an action regarding the business permit for the Salvation Army because they do not allege an injury affecting their own legal rights. The Village claims that although the Moratorium suspended the issuance of business licenses for resale shops for 90 days, it did not preclude Plaintiffs from continuing to rent the property during that time period to anyone else for any purpose other than operating a resale shop. R. 66 at 5.

F.A.S.T. claims it has in fact been injured. Relying on the third amended complaint, F.A.S.T. asserts the following: (1) the Salvation Army applied for a business license to occupy 25,000 square feet at Plaintiffs' property as a tenant; (2) F.A.S.T. had an executed lease with the Salvation Army for it to occupy the space in the East Property, which was conditional to it securing a business license; and (3) the Salvation Army terminated its lease with F.A.S.T. because the Village effectively denied the Salvation Army's business license by passing a zoning amendment prohibiting resale uses in the B2 zoning district. R. 67 at 4-5. In

support, Plaintiffs cite *Oxford Bank & Trust & Fifth Ave. Prop. Mgmt. v. Vill. of La Grange*, 879 F. Supp. 2d 954, 968 (N.D. Ill. 2012). In *Oxford*, landlords filed a § 1983 action against the village of LaGrange, among others, claiming that a zoning ordinance that prevented a tenant from opening a pawn shop violated their federal and state constitutional rights and common law. The Court noted, in the context of the plaintiffs' equal protection claim, that "[a]s the only landlords with an existing lease affected by the zoning change, the plaintiffs had shown the zoning change had an adverse impact on them, a necessary component of standing and injury." *Id.* at 969. The court noted that although defendants argued that the tenant's property rights were at issue—not plaintiffs'—"it would be a stingy reading of the plaintiffs' arguments to limit their proclaimed interest only to the *de facto* revocation of their tenant's business license. The landlords had an executed lease with a tenant . . . and that use was permitted at the time of the lease." *Id.* at 973. The Village does not respond to this argument in its reply. Although the plaintiffs in *Oxford* explicitly pled constitutional claims, relying on *Oxford* and accepting the allegations in Plaintiffs' complaint as true, the Court finds that Plaintiffs have alleged standing based on cognizable injury—the termination of the lease.[7] Although the Village asserts on information and belief that the lease was terminated prior to the zoning ordinance amendment, Plaintiffs' allege that the Salvation Army terminated its

_____

[7] Although *Oxford* was decided on a motion for summary judgment, the Court there, viewing the facts in the light most favorable to the landlords, also found "an existing lease," despite the defendants' argument that it was not in effect. *Id.* at 969 n. 7.

lease with F.A.S.T. because of the amendment. It is premature at this stage to resolve this issue of fact.

## II. Count I

In Count I of the third amended complaint, Plaintiffs allege that SSA #6 disproportionately benefits the owner of the West Property to the detriment of the East Property. Plaintiffs allege that the disparity between the East and West Properties violates Article IX, section 4(a) of the Illinois Constitution, which provides "[e]xcept as otherwise provided in this Section, taxes upon real property shall be levied uniformly by valuation ascertained as the General Assembly shall provide by law." R. 65 ¶ 41.[8] Plaintiffs also allege that the Village has violated the SSA Act and "the Ordinance." *Id.* ¶¶ 44-45. Plaintiffs ask the Court to: (1) enjoin the Village from disbursing additional money from the SSA fund until an accounting is made; (2) order a reassessment of the East Property to ensure uniformity; (3) order an assessment and evaluation of the TIF tax for the East Property; (4) order an assessment and evaluation of the SSA tax for the East Property; (5) order an accounting from the Village to determine the total amount of the SSA benefits which have been distributed and require the Village to reallocate the proper share of taxes between the West Property and East Property on a proportionate, rational,

---

[8] Plaintiffs inexplicably assert that "the Village mistakenly characterizes the Complaint to allege a violation of the Illinois Constitution" and that "nowhere in the Complaint are those allegations." R. 67 at 7 (claiming that "[t]he Village's sleight of hand maneuvering to divert this Court's attention from its own wrongful acts is transparent."). Paragraph 41 of Plaintiffs' third amended complaint clearly states that the disparity between the Properties violates the Illinois Constitution. In any event, Plaintiffs have conceded this argument.

and reasonable basis; (6) enter monetary judgment against the Village for plaintiffs in the amount of excess of $500,000; (7) order the Village to pay Plaintiffs' attorneys' fees and costs. R. 65 at 9-10.

The Village moves to dismiss Count I on multiple grounds. First, the Village argues that the claim is untimely and improper. Specifically, the Village claims Plaintiffs in fact challenge the 2013 tax bill and calculation but failed to follow the proper procedural steps in state court within the time period required by statute to do so. R. 66 at 6 (citing 35 ILCS 200/23-10, 23-15(a) (West 2012) which instructs that after preliminary payments, a party "may file a tax objection complaint under Section 23-15 within 165 days after the first penalty date of the final installment of taxes for the year in question."). Additionally, the Village argues that under 35 ILCS 200/23-15(b)(1), plaintiffs cannot seek diminution of value of their property as their tax challenge is the complete remedy under law. R. 66 at 7. Finally, the Village argues that Count I fails to state a cause of action. *Id*. Because the Court finds that the Village fails to state a claim in Count I, it will address that argument first.

### A. Failure to State a Claim

The Village asserts that Count I should be dismissed for failure to state a cause of action and because it is unclear what is being pled. The Village argues that Plaintiffs fail to allege wrongdoing by the Village, R. 66 at 8, and fail to cite any law mandating taxpayers within a SSA receive equal amounts of the SSA proceeds or amounts equal to the SSA taxes they paid.

As in the initial complaint, Plaintiffs' third amended complaint and its response to the Village's motion to dismiss are somewhat vague on the question of which requirements of the Act and Ordinance 09-27 are actually at issue. Plaintiffs assert that paragraphs 43 and 44 "specifically allege the violation of the Act that occurred from the Village's actions." R. 67 at 7. Paragraph 43 states that the allegedly disproportionate distributions and incorrect taxations are unlawful because the monies from SSA #6 have disproportionately benefitted the West Property. R. 65 ¶ 43. Paragraph 44, referring to the manner in which SSA taxes are levied, is identical in substance to paragraph 36 of the initial complaint. It states that "[t]he Act requires that the special service tax must be levied and extended on a basis that provides a rational relationship between the amount of the tax levied against each lot, block, track, and parcel of land in the Special Service Area and Special Services benefits rendered." *Id.* ¶ 44.

Plaintiffs' only reference to a specific requirement of the SSA Act is in paragraph 16 of its third amended complaint, Section 27-75:

> In lieu or in addition to an ad valorem property tax, a special tax may be levied and extended within the special service area on any other basis that provides a rational relationship between the amount the tax levied against each lot, block, tract and parcel of land in the special service area and the special service benefit rendered.[9]

---

[9] The first and third paragraphs of Section 27–75 state that "[i]f a property tax is levied, the tax shall be extended ... in the special service area ... based on equalized assessed values." 35 ILCS 200/27–75. Such a tax can take the form of either "an *ad valorem* tax based on the whole equalized assessed value of the property," or, in some instances, an *ad valorem* tax based on "the equalized assessed value of the land in a special service area, without regard to improvements." *Id.* An *ad valorem* tax is a tax "proportional to the value of the thing taxed." Black's Law Dictionary (9th ed. 2009).

Plaintiffs made the same reference in their initial complaint. They offer no new basis or theory of how the Village violates a requirement of the SSA Act. As in their first complaint, Plaintiffs appear to read the Act to "require[s] that the special service tax must be levied and extended on a basis that provides a rational relationship between the amount of the tax levied against each lot, block, track, and parcel of land in the Special Service Area and Special Services benefits rendered." R. 65 ¶ 44. The Court already addressed and rejected this argument in ruling on the Village's motion to dismiss the first complaint, and will not repeat that ruling in full here.

In sum, Section 27-75 of the SSA is not as broad as Plaintiffs assert. Read as a whole, it does not impose a general requirement that there be a rational relationship between the amount of tax levied on a particular property in a special service area and the special benefit rendered to the property. *Bank of Camden v. Vill. of W. Dundee*, 2013 WL 4052542, at *2 (N.D. Ill. Aug. 12, 2013). Section 27-75 requires that taxes must be apportioned within a special service area *either* "based on equalized assessed values" *or* "any other basis that provides a rational relationship between the amount of the tax levied against each lot, block, tract and parcel of land in the special service area and the special service benefit rendered." 35 ILCS 200/27-75. As the Court previously noted, the SSA Act presumes that *ad valorem* taxes based on equalized assessed values are rational, and the "rational relationship" test comes into play if a municipality relies on some "other" basis for apportioning taxes. *Bank of Camden,* 2013 WL 4052542, at *3 (citing *Cnty. of Will v.*

*Vill. of Rockdale*, 589 N.E.2d 1017, 1017-18 (Ill. App. Ct. 1992) (applying Section 27-75's rational relationship test where a special tax to pay for water main improvements "was not based on assessed values of the real property" but "was based on the percentage of front footage of each parcel to the total front footage of the streets in the special service area")).

The local ordinances related to the SSA #6 are consistent with apportioned taxes based on equalized assessed values. Without citation to specific language, Plaintiffs claim that pursuant to Ordinance 09-27, which "propos[es] the establishment of the SSA," a rational relationship is required between the amount of SSA taxes levied for lands within the SSA and the benefits rendered for those properties. However, the language in Ordinance 09-27 more closely reflects the language in the Act that the taxes must be apportioned *either* "based on equalized assessed values" *or* "any other basis that provides a rational relationship." Ordinance 09-27 states that the taxes to be levied "shall be subject to allocation, determination, levy and extension on an ad valorem basis or, as determined by the Municipality, on another basis (including, for example, area) that provides a rational relationship between the amount of the tax levied against each lot . . . and the Special Services benefit rendered." R. 62-1, § 2(g). As the Court noted in its prior opinion, Ordinance 10-15 "concerning the establishment of special service area number six" and adopted by the Village after Ordinance 09-27 apportions taxes based on equalized assessed values. R. 62-1 at 40, Ex. D, Ordinance 10-15 § 2 ("the applicable special service area taxes (subject to allocation, determination, levy and

extension on an *ad valorem* basis against each lot, block, tract and parcel of land in the Area) shall be and are hereby authorized . . .").

Because the taxes are allocated on an *ad valorem* basis, the "rational relationship" test that expressly applies only to taxes "in lieu of or in addition to an *ad valorem* property tax" does not come into play. Ordinance 09-27 proposed the SSA and plainly stated that the taxes to be levied would be subject to determination on an ad valorem basis *or* another basis that provides a rational relationship between the amount of taxes and benefits rendered. Plaintiffs do not explain how that is inconsistent with Ordinance 10-15.[10] As a result, Plaintiffs' "rational relationship" theory does not provide a plausible claim that the Village is violating the SSA Act or the Ordinances and therefore, Count I is dismissed.[11] The Court previously provided the Bank with the opportunity to file an amended complaint if it had some other theory as to how the Village was violating a requirement of the

---

[10] By their language, Ordinance 09-27 is "an ordinance proposing the establishment of Special Service Area Number Six," Ordinance 10-15 is the "ordinance concerning the establishment of Special Service Area Number Six," and Ordinance 10-16 is "an ordinance providing for the issuance of Special Service Area Number Six . . . tax bonds." R. 62-1 at 31, 39, and 50.

[11] The Village also moves to dismiss Plaintiffs' request for attorneys' fees in Count I based on Plaintiffs' failure to cite any Illinois law or federal statute authorizing such fees. Because Plaintiffs fail to state a claim in Count I, the Court need not address the attorneys' fees issue. Nonetheless, Plaintiffs fail to respond to this argument, and therefore it is waived. *Jones v. Connors*, No. 11 C 8276, 2012 WL 4361500, at *7 (N.D. Ill. Sept. 20, 2012) (A party's failure to respond to arguments the opposing party makes in a motion to dismiss operates as a waiver or forfeiture of the claim and an abandonment of any argument against dismissing the claim) (citing *Alioto v. Town of Lisbon*, 651 F.3d 715, 719 n. 1, 721 (7th Cir. 2011) (forfeiture occurs where the "litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss")). The request for attorneys' fees is dismissed.

SSA Act or the Ordinance. R. 39. Because Plaintiffs have again failed to state a plausible claim that the Village is violating the SSA Act or the Ordinance and have not provided a new theory, Count I is dismissed with prejudice.

## III. Count III

In Count III, Plaintiffs ask the Court to issue a writ of mandamus pursuant to Illinois law requiring the Village Clerk to issue a business license to the Salvation Army "in order for the Salvation Army to occupy and lease certain space at the East Property and to cease to exercise any powers or duties with respect to the prohibition of the Salvation Army to lease and occupy space at the East property." R. 65 ¶ 76.

The Village argues that Plaintiffs' claim in Count III is not ripe because Plaintiffs failed to exhaust administrative remedies by challenging the amendment passed by the Village or the denial of the Salvation Army's business license in state court. R. 66 at 9. In response, Plaintiffs claim that the cases the Village cites are inapplicable because they relate to parties challenging zoning ordinances and making constitutional and property rights claims in the context of land use disputes, while their own complaint asserts claims for mandamus and declaratory relief. The Court need not decide that issue because even accepting Plaintiffs' argument that their claims for mandamus and declaratory relief should not be analyzed as property rights claims, the Court finds the Plaintiffs have failed to state a claim for mandamus in Count III.

"Mandamus is an extraordinary remedy to enforce, as a matter of right, 'the performance of official duties by a public officer where no exercise of discretion on his part is involved.'" *Lewis E. v. Spagnolo,* 710 N.E.2d 798, 813 (1999) (quoting *Madden v. Cronson,* 501 N.E.2d 1267 (1986)); *Ahmad v. Chicago Sch. Reform Bd. of Trustees*, No. 98 C 6983, 1999 WL 965453, at *3 (N.D. Ill. Sept. 30, 1999) ("Under Illinois law, 'a writ of mandamus commands a public officer to perform an official, nondiscretionary duty that the petitioner is entitled to have performed and that the officer has failed to perform.'") (quoting *Chicago Bar Ass'n v. Ill. State Bd. of Elections,* 641 N.E.2d 525, 527 (Ill. 1994)).

Rules for pleading mandamus are the same as those applicable to actions at law. *Noyola v. Bd. of Educ. of the City of Chicago,* 688 N.E.2d 81 (1997). To survive a motion to dismiss for legal insufficiency, a complaint seeking mandamus "must allege facts which establish a clear right to the relief requested, a clear duty of the respondent to act, and clear authority in the respondent to comply with the writ." *Noyola,* 688 N.E.2d 86; *Baldacchino v. Thompson,* 682 N.E.2d 182 (1997)). If public officials have failed to comply with requirements imposed on them by statute, a court may compel them to do so by a writ of mandamus, provided the requirements for mandamus have been satisfied. *Park Superintendents' Prof'l Ass'n v. Ryan*, 745 N.E.2d 618, 624-27 (2001) (citing *Noyola,* 688 N.E.2d 81)). But mandamus is not appropriate to regulate a course of official conduct or enforce the performance of official duties generally. *Park Superintendents'*, 745 N.E.2d at 624-25 (citing *In Interest of F.B.,* 564 N.E.2d 173, 184 (6th Dist. 1990). "The writ will not lie when its

effect is 'to substitute the court's judgment or discretion for that of the body which is commanded to act.'" *Lewis E. v. Spagnolo*, 710 N.E.2d 798, 813 (1999) (citing *Chicago Ass'n of Commerce & Indus. v. Reg'l Trans. Auth.,* 427 N.E.2d 153 (1981), quoting *Ickes v. Bd. of Supervisors,* 114 N.E.2d 669 (1953)).

As the Village argues, Plaintiffs' mandamus claim should be dismissed because Plaintiffs have not alleged a "clear, affirmative right to relief" in the form of the Salvation Army's business license for use in the East Property—particularly in light of the fact that the Village's May 5, 2014 amendment made resale shops in the B-2 zoning district a non-permitted use. Although not explicitly stated by Plaintiffs in their response, their complaint suggests that their right to mandamus is based on the allegation that the Business License Commission meeting on May 6, 2014 violated the Open Meetings Act, 5 ILCS 120 *et seq.*. That meeting resulted in the BLC's May 9, 2014 letter denying the Salvation Army's application for a business license. R. 65 ¶¶ 58-65. The Open Meetings Act has been held to empower reviewing courts to remedy violations of the Act:

> granting a[sic] relief by mandamus requiring that a meeting be open to the public, granting an injunction against future violations of this Act, ordering the public body to make available to the public such portion of the minutes of a meeting as is not authorized to be kept confidential under this Act, or declaring null and void any final action taken at a closed meeting in violation of this Act.[12]

---

[12] Plaintiffs claim (without citation) that if there is noncompliance with OMA, the court "may, if it determines a violation has occurred, grant relief by mandamus, an injunction ordering a public body to make available minutes, or declare null and void any action taken at a meeting," omitting that the mandamus in the Act specifically refers to "requiring that a meeting be open to the public." R. 67 at 11; 5 ILCS 120/3.

5 ILCS 120/3; *Roller v. Bd. of Educ. of Glen Ellyn Sch. Dist. No.41*, No. 05 C 3638, 2006 WL 200886, at *5 (N.D. Ill. Jan. 18, 2006). Even if that kind of relief were practical and justified, Plaintiffs seek much more.

Here, Plaintiffs seek a mandamus for this Court to order the Village Clerk to issue a business license to the Salvation Army to occupy and lease space in the East Property and cease to exercise power or duties with respect to the prohibition of the Salvation Army to do so. R. 65 ¶ at 14. Plaintiffs cite no authority in support. They have not provided any authority which would require the Village to provide the Salvation Army a business license or permit. Simply alleging that the Village is responsible for the issuance of business licenses is not enough to show "a plausible entitlement to the requested extraordinary relief." *Second Amendment Arms v. City of Chicago*, No. 10-CV-4257, 2012 WL 4464900, at *14 (N.D. Ill. Sept. 25, 2012) (citations omitted).[13]

Plaintiffs cannot show they have a clear, legal right to compel the Village to act.[14] Count III is devoid of any other language indicating the particular law or legal theory under which Plaintiffs seek relief and is dismissed. If Plaintiffs have

[13] Additionally, as noted, to establish standing, a plaintiff must show redressability of the injury if a court finds in the plaintiff's favor. *Dominick v. Town of Cicero*, No. 09 C 4643, 2009 WL 4506319, at *1 (N.D. Ill. Nov. 30, 2009) (citing *Lujan,* 504 U.S. at 560–61)). *Brandt v. Vill. of Winnetka, Ill.*, 612 F.3d 647, 649 (7th Cir. 2010) (standing exists when a judicial decision in the plaintiff's favor would redress that injury). It is far from clear that the Salvation Army would be permitted to operate as a resale retailer in the face of the amendment prohibiting resale shops in the East Property even if it were issued a business license.

[14] *Nott v. Wolff,* 18 Ill.2d 362 (1960), which Plaintiffs cite to support their mandamus claim, does not address the Open Meeting Act and Plaintiffs fail to describe its applicability to their claims.

some other theory as to how they are entitled to mandamus relief on Count III, they may seek leave to file an amended complaint on or before December 19, 2014. As it stands, Plaintiffs have not stated a plausible claim for mandamus.

## IV. Count IV

In Count IV, Plaintiffs ask the Court to enter a declaratory judgment 1) finding that the February 3, 2014 moratorium is arbitrary and unreasonable and does not apply to the Salvation Army; and 2) declaring the legal fees for the Village's attorney related to this matter not be reimbursed through the SSA #6 improvement fund.

### A. Moratorium

The Village argues that Plaintiffs' claim for declaratory judgment about the applicability of the Moratorium is moot because, by its terms, the Moratorium already expired on May 5, 2014. Plaintiffs argue that their claim is not moot because it is unclear whether the Moratorium has in fact terminated. Specifically, Plaintiffs argue that the Moratorium may not have been terminated because it was not adopted by way of an official ordinance nor is there a Village ordinance or resolution reflecting the Moratorium's expiration. Plaintiffs cite no authority for their argument that the Moratorium might still be in effect.

When circumstances change during litigation such that there is no longer any case or controversy, the case is moot. *Ovadal v. City of Madison, Wis.*, 469 F.3d 625, 628 (7th Cir. 2006) (citing *Powell v. McCormack,* 395 U.S. 486 (1969)). In this case, Plaintiffs filed the third amended complaint after the expiration of the Moratorium,

so their claims with respect to its application are moot now as they were when filed. The relief that Plaintiffs seek would have no legal effect now that the Moratorium has expired. Those claims are dismissed as moot.

**B. Attorneys' Fees**

The Village disputes Plaintiffs' claim seeking a declaratory judgment that the legal fees for the Village's attorney not be reimbursed through the SSA #6 improvement fund. The Village argues that the disbursement agreement for SSA #6 allows for the use of SSA funds for "legal," among other things, and therefore the Village is entitled to use the funds for legal expenses. R. 66 at 14. In the introduction to their response, Plaintiffs state that "Exhibit B to Ordinance 10-16 does not permit SSA proceeds to be used for reimbursement (3rd Am. Compl. ¶¶ 92-93), thus prohibiting the Village to reimburse its attorneys in this litigation." R. 67 at 1, 3. Also in the third amended complaint, Plaintiffs allege that the attorneys' fees are impermissible reimbursements according the Exhibit B to Ordinance 10-16. Exhibit B, in its description of the special services, states that the bond proceeds "shall be applied only to new acquisition, construction and installations and not to any reimbursements." R. 62-1 at 74.

While, as the Village argues, article one of the disbursement agreement states that SSA #6 funds may be used for "(vii) design, legal, finance and administration," R. 62-1 at 98, Ex. L, Art. 1 § 1.01, it also states that the funds should "exclud[e] reimbursements" within the Shopping Center of facilities and improvements for that same category of items, including legal. *Id.* Reading the third

amended complaint in the light most favorable to the Plaintiffs and based on the additional language included in the ordinances and their exhibits attached to the complaint, the Court finds it premature to dismiss Plaintiffs' claims regarding the attorneys' fees on the basis that the Village sets forth. A motion to dismiss is not the proper stage to decide these issues. *Russo v. Bank of Am., N.A.*, No. 14 CV 382, 2014 WL 3811116, at *7 (N.D. Ill. Aug. 1, 2014) (declining to resolve ambiguities, as a matter of law, at the motion-to-dismiss stage) (citing *Dawson v. Gen. Motors Corp.,* 977 F.2d 369, 373 (7th Cir.1992) ("If the language of an alleged contract is ambiguous . . . , the interpretation of the language is a question of fact [that the trial court] cannot properly determine on a motion to dismiss." (quoting *Quake Constr., Inc. v. Am. Airlines, Inc.,* 141 Ill.2d 281 (1990))).[15] As such, the Village's motion to dismiss Count IV is granted except as to the claim for a declaratory judgment regarding attorneys' fees.[16]

---

[15] Count V of Plaintiffs' third amended complaint seeks to enjoin and restrain the Village from paying its attorneys' fees to the Village's attorneys from the SSA #6 fund. R. 65 at 19. As noted, while the Village stated in the introduction to its motion that Count V was among those it sought to dismiss, R. 66 at 1, the Village fails to name or discuss Count V in the body of its motion or reply. However, even if the Village had included Count V by name or discussed it in the context of Count IV which also addressed whether legal fees may be paid out of the SSA #6 fund, the Court would not dismiss Count V for the same reason that it denies dismissal of that aspect of Count IV.

[16] The Village states that Plaintiffs complain in both Counts III and IV about the Village's use of SSA #6 funds to pay legal expenses, R. 66 at 14, R. 68 at 2, however Count III does not mention that argument and Plaintiffs fail to cite any specific section of the third amended complaint in support of their statement. *Id.*

## Conclusion

For the reasons stated, the Court grants the Village's partial motion to dismiss Counts I, III, and IV of Plaintiffs' third amended complaint, excluding Count IV's request for declaratory judgment regarding payment of the Village's attorneys' fee. R. 66. The Bank is dismissed as a plaintiff for lack of standing.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated:  November 21, 2014